# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN TOMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-01140-MHH-SGC |
| | ) | |
| CHERON T. NASH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this action, *pro se* plaintiff John Tomes asserts Eighth Amendment claims against several defendants under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).[1]  Mr. Tomes alleges that while he was housed at Talladega Federal Correctional Institution—FCI-Talladega—the prison did not have a dentist on staff and, consequently, did not have the ability to perform dental x-rays or extractions for six months.  Mr. Tomes asserts that during that six-month period, he developed an infection and lost an otherwise healthy tooth because he could not receive adequate dental treatment.  After reviewing the evidence that the parties provided, the magistrate judge entered a report in which she recommended that the Court grant

---

[1] "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 70 (2001).  "If a federal prisoner in a BOP facility alleges a constitutional deprivation, he may bring a *Bivens* claim against the offending individual officer, subject to the defense of qualified immunity. The prisoner may not bring a *Bivens* claim against the officer's employer, the United States, or the BOP."  *Malesko*, 534 U.S. at 72.

the defendants' motion for summary judgment and deny Mr. Tomes's motion for summary judgment.  (Doc. 36).  Mr. Tomes has objected to the report and recommendation.  (Doc. 37).

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  A district judge must "make a *de novo* determination of those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1); *see also* FED. R. CIV. P. 72(b)(3) ("The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objective to.").  A district court's obligation to "'make a de novo *determination* of those portions of the report or specified proposed findings or recommendations to which objection is made,'" 447 U.S. at 673 (quoting 28 U.S.C. § 636(b)(1)), requires a district judge to "'give *fresh consideration* to those issues to which specific objection has been made by a party,'" 447 U.S. at 675 (quoting House Report No. 94-1609, p. 3 (1976)).  *United States v. Raddatz*, 447 U.S. 667 (1980) (italics in *Raddatz*).

In his objections, Mr. Tomes argues that the magistrate judge overlooked the essence of his complaint.  Mr. Tomes states that his deliberate indifference claim not only is about the pain he experienced but also about the tooth he lost unnecessarily

because of inadequate dental care at FCI-Talladega.[2]  Mr. Tomes asserts that for six months, he received no treatment other than ibuprofen for his dental issues because FCI-Talladega did not have a dentist on staff, and the dentists who visited FCI-Talladega could "only give general assessments as to the condition of the wisdom tooth & the [adjacent] molar" because the prison did not have an x-ray machine or "extraction equipment."  (Doc. 37, pp. 2-3).[3]  Mr. Tomes argues that he developed an infection because the prison was not able to perform a "routine extraction" of his

---

[2] With respect to the pain Mr. Tomes experienced, Mr. Tomes's medical records indicate that on April 30, 2020, he complained to Nurse Thomas of pain in his wisdom tooth that had lasted two months.  (Sealed Doc. 27, p. 27).  Mr. Tomes rated his pain at level 5, and he reported that the pain was constant.  (Sealed Doc. 27, p. 27).  At the time, no infection was noted.  (Sealed Doc. 27, p. 27).  Nurse Thomas placed Mr. Tomes on dental sick call and recommended that he get ibuprofen at the commissary.  (Sealed Doc. 27, p. 28).

On August 20, 2020, Mr. Tomes complained to Nurse Hulsey of a toothache in his lower right tooth, and he rated his pain at level 10.  (Sealed Doc. 27, p. 14).  Mr. Tomes stated that he had been experiencing the pain for "1-2 Weeks."  (Sealed Doc. 27, p. 14).

Mr. Tomes's October 2020 dental records include pain reports.  (Sealed Doc. 27, p. 52).

In an affidavit that he provided in support of his summary judgment motion, Mr. Tomes stated that he complained verbally to Ms. Holly Craft and Ms. Powell.  Ms. Craft and Ms. Powell told Mr. Tomes that he would receive treatment when FCI-Talladega hired a dentist.  (Doc. 31-1, p. 1).

[3] As the magistrate judge pointed out, the wording of Mr. Tomes's complaint creates the impression that he did not see a dentist at all between April 2020 and October 2020.  (Doc. 36, p. 12) (citing Doc. 1, p. 12).  With the benefit of Mr. Tomes's medical records and objections, it appears that he is alleging that he was not able to see a staff dentist and receive necessary medical treatment between May 2020 and October 2020.  In his opposition to the defendants' motion for summary judgment, Mr. Tomes stated that he is claiming that the defendants "knowlingly maintain[ed] an understaffed Health Services department, that led to the loss of [his] molar" and that "six months of understaffing fail[ed] to meet reasonable standards in regards to healthcare."  (Doc. 24, pp. 5-6; *see also* Doc. 30, p. 2) ("[T]he inaction of hiring a dentist led to loss of my molar (tooth #31).); Doc. 30, p. 3 ("[T]he removal of (tooth #32) my wisdom tooth was needed on 5-21-23.  Yet the process was delayed 4 ½ months due to Defendant's [*sic*] failure to staff a dentist" and "failure to staff a dentist led to the loss of my tooth [(tooth #31)].").

wisdom tooth in a timely manner, and the six-month delay of the extraction caused him to lose his molar too, "the more functional tooth." (Doc. 37, p. 4). Mr. Tomes points out that he agreed with the May 21, 2020 diagnosis that his wisdom tooth needed to be extracted and that his deliberate indifference claim concerns the "systemic & gross deficiency in staffing" of the dental department at FCI-Talladega that caused him to have to wait until October 2020 for an x-ray and extraction. (Doc. 37, pp. 6. 10 (quoting *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991)); *see* Sealed Doc. 27, pp. 36, 49 (medical records showing date of x-ray and extraction). Mr. Tomes sums up his allegation this way:

> The original diagnosis was for tooth #32 to be x-rayed [and] extracted. As the months passed[,] tooth #32 kept pushing into tooth #31 (molar) and caused an abcess [*sic*], infection, decay, and eventually the removal of the molar which is the crux of the argument.

(Doc. 37, p. 8).

The government's constitutional obligation "to provide medical care for those whom it is punishing by incarceration," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), includes the obligation to provide dental care, *Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980). As noted in the first report in this case, "'dental care is one of the most important medical needs of inmates.'" (Doc. 6, p. 6) (quoting *Watts v. Flowers*, No. 10-3107-AKK, 2013 WL 3816549, at *2 (N.D. Ala. July 22, 2013) (quoting

*Hunt v. Dental Dept.,* 865 F.2d 198, 200 (9th Cir. 1989)).[4]  "[E]ven where medical care is ultimately provided, a [government] official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."  *Ireland v. Prummell*, 53 F.4th 1274, 1293 (11th Cir. 2022); *Sears v. Warden Okeechobee Corr. Inst.*, 762 Fed. Appx. 910, 918 (11th Cir. 2019) (internal citations omitted) (same); *Melton v. Abston*, 841 F.3d 1207, 1223 (11th Cir. 2016) ("A defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference.").

A prisoner may assert an Eighth Amendment deliberate indifference claim for injuries he suffers because of inadequate dental care.  As the Eleventh Circuit Court of Appeals explained in *Goebert v. Lee Cnty.*:

> to prove deliberate indifference a prisoner must shoulder three burdens. First, [he] must satisfy the objective component by showing that she had a serious medical need.  *Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam).  Second, [he] must satisfy the subjective component by showing that the prison official acted with deliberate

---

[4] In *Hunt,* the Ninth Circuit quoted the Tenth Circuit's holding in *Ramos v. Lamm.*  In *Ramos*, the Tenth Circuit observed:  "Prisoners generally have more extensive dental problems than the average citizen. Consequently dental care is one of the most important medical needs of inmates."  *Ramos*, 639 F.2d at 576.

In *Hunt*, the Ninth Circuit Court of Appeals held that "the eighth amendment requires that prisoners be provided with a system of ready access to adequate dental care."  *Hunt*, 865 F.2d at 200.

indifference to [his] serious medical need. *Id.* Third, as with any tort claim, [he] must show that the injury was caused by the defendant's wrongful conduct. *See Hale v. Tallapoosa County,* 50 F.3d 1579, 1582 (11th Cir. 1995).

510 F.3d 1312, 1326 (11th Cir. 2007).

With respect to the objective component of Mr. Tomes's deliberate indifference claim, a "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Brooks v. Miller*, 78 F.4th 1267, 1284 (11th Cir. 2023). In *Farrow v. West*, the Eleventh Circuit stated: "the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need to show objectively a substantial risk of harm." *Farrow v. West*, 320 F.3d 1235, 1244 (11th Cir. 2003).

The evidence, viewed in the light most favorable to Mr. Tomes demonstrates that he had a serious medical need. On April 3, 2020, Mr. Tomes requested a dental sick call for examination of his wisdom tooth. Mr. Tomes indicated that he had been experiencing pain in his wisdom tooth for two months. (Sealed Doc. 27, p. 70). Nurse Thomas saw Mr. Tomes that day. Nurse Thomas's notes indicate that Mr. Tomes complained of pain in his wisdom tooth and in his right lower back molar. Nurse Thomas saw no evidence of a cavity or swelling in the molar. (Sealed Doc. 27, p. 27; *see also* (Sealed Doc. 27, p. 70) (handwritten notation on the top of April

3, 2020 sick call form stating "back [right] lower molar with pain [no] abcess [sic]"). Nurse Thomas scheduled Mr. Tomes for a dental sick call.  (Sealed Doc. 27, p. 27).

Mr. Tomes's medical records indicate that seven weeks later, on May 21, 2020, he saw Dr. Beasley, a dentist who travelled to FCI-Talladega from another BOP facility.  (Doc. 23-2, p. 2).  After a limited examination, Dr. Beasley determined that Mr. Tomes had "[d]isturbances in tooth eruption" of his lower right wisdom tooth; that the tooth was "mesioinclined," meaning angled toward the front of Mr. Tomes's mouth; and that Mr. Tomes experienced "episodic bouts of pericoronitis over several months with" his wisdom tooth, meaning that the gum surrounding the erupting tooth would become infected and swollen.  (Sealed Doc. 27, p. 56).[5]  Dr.

---

[5] "Mesial impaction is the most common type.  It occurs when your wisdom tooth is angled toward the front of your mouth."   https://my.clevelandclinic.org/health/diseases/22296-impacted-wisdom-teeth (last visited April 5, 2024).



© MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH. ALL RIGHTS RESERVED.

https://www.mayoclinic.org/diseases-conditions/wisdom-teeth/symptoms-causes/syc-20373808 (last visited April 5, 2024).  The Court offers this visual for purposes of illustration.  Because there are no x-rays in the record, the record does not indicate the exact angle at which Mr. Tomes's right rear wisdom tooth was erupting toward the front of his mouth and pressing on the adjacent molar. In the absence of x-rays, a fundamental dental diagnostic tool, the Court draws inferences in favor of Mr. Tomes and assumes that the angle of growth of tooth #32, Mr. Tomes's wisdom tooth, was similar to this illustration.  The record indicates that neither Dr. Beasley's May 2020 order for an x-ray of Mr. Tomes's wisdom tooth nor Dr. Colon-Avilles's September 2020 order for an x-ray of Mr. Tomes's wisdom tooth was fulfilled, so there is no medical evidence showing the angle of eruption until October 2020 when Dr. Friedman finally x-rayed the right side of Mr. Tomes's mouth.

"Pericoronitis can develop when wisdom teeth only partially erupt (break through the gum).  Soft tissue growth over a partially erupted wisdom tooth is called an operculum.  Bacteria can get trapped under the operculum.  That allows an opening for bacteria to enter around the tooth and cause infection and swelling.  Food debris, bacteria, or plaque, a bacterial film that remains on teeth after eating, may also get caught underneath the gingiva, a flap of gum around a tooth.  If it stays there, it can irritate the gum and lead to pericoronitis.  In serious cases, the swelling and infection may extend beyond the jaw to the cheeks and neck."  https://www.webmd.com/oral-

Beasley stated that the wisdom tooth, tooth #32, should be x-rayed and extracted, but he did not do either during the May 21, 2020 visit.  (Sealed Doc. 27, p. 56).  Dr. Beasley ordered an x-ray of the wisdom tooth, tooth #32, but the x-ray was not completed during the May 2020 visit.  (Sealed Doc. 27, p. 56).[6]

Mr. Tomes's records indicate that over the next several months, BOP did not arrange for the extraction of his wisdom tooth, and, as a result, the wisdom tooth damaged the adjacent molar.  In August 2020, Nurse Hulsey found that Mr. Tomes had a "Dental Problem Needing Dental Followup" for a "Dental abscess" for which Nurse Hulsey prescribed penicillin and acetaminophen.  (Sealed Doc. 27, p. 15). The record of Mr. Tomes's August 2020 dental sick call indicates that Nurse Fuller

---

health/pericoronitis (last visited April 5, 2024); *see also* *https://my.clevelandclinic.org/health/diseases/24142-pericoronitis* (last visited April 5, 2024) ("Pericoronitis is inflammation of the gum tissue around your wisdom teeth. This can happen when a tooth is still partially impacted. Pericoronitis symptoms range from mild to severe and may include bad breath, pus and facial swelling. Left untreated, pericoronitis can be dangerous. Prompt care is essential.").

[6] From the limited examination that he conducted in Mr. Tomes's housing unit, Dr. Beasley found gingiva on the crown of Mr. Tomes's wisdom tooth, but he did not find a cavity. (Sealed Doc. 27, p. 55).  Dr. Beasley's notes are silent with respect to tooth #31.

Dr. Beasley also noted that Mr. Tomes's upper right wisdom tooth should be x-rayed and extracted. Neither the x-ray nor the extraction of the upper right wisdom tooth was performed in May 2020. (Sealed Doc. 27, p. 56; *see also* Doc. 36, p. 7).

In June and July of 2020, Mr. Tomes continued to complain of pain on the right side of his head, though he did not specify dental pain.  Mr. Tomes saw a medical doctor in June of 2020 because he was experiencing "[p]ressure sensation on the right side of head."  (Sealed Doc. 27, p. 21; Sealed Doc. 27, pp. 20, 22).  He saw an optometrist in July 2020 who determined that the "sensation" that Mr. Tomes was experiencing on the right side of his head "near [the] occipital region" was not associated with his eyes.  (Sealed Doc. 27, pp. 17-18).

scheduled an appointment for Mr. Tomes with a dental hygienist on August 25, 2020, (Sealed Doc. 27, p. 15), but the Court has not found an August 25, 2020 record for a visit with a dental hygienist.  Mr. Tomes saw a dentist who travelled to FCI Talladega on September 3, 2020.  The dentist, Dr. Colon-Aviles, conducted a limited examination in Mr. Tomes's housing unit.  Mr. Tomes reported pain he associated with his wisdom tooth, but Dr. Colon-Aviles determined that the wisdom tooth, #32, was angled toward Mr. Tomes's molar, #31, and Mr. Tomes needed an x-ray "to rule out distal decay of tooth #31."  (Sealed Doc. 27, p. 15).[7]

Just over one month after he saw Dr. Colon-Aviles, Mr. Tomes saw Dr. Friedman, FCI-Talladega's new dentist.  Dr. Friedman first examined Mr. Tomes on October 5, 2020 and obtained x-rays of Mr. Tomes's teeth.  Dr. Friedman noted that an x-ray confirmed his observation of decay in tooth #31 on the distal and occlusal surfaces.  (Sealed Doc. 27, pp. 52-53).  Dr. Friedman also noted that Mr. Tomes's wisdom tooth had contacted the distal surface of tooth #31 as the wisdom tooth emerged.  (Sealed Doc. 27, p. 53).  Dr. Friedman found necrosis of the pulp in tooth #31, meaning that the pulp was dead and could not be restored.  (Sealed Doc. 27, p. 53).  Dr. Friedman "[s]trongly emphasized" to Mr. Tomes "the risks associated with

---

[7] Mr. Tomes also complained of dental pain in a September 8, 2020 sick call request in which he sought treatment for thumb pain.  (Sealed Doc. 27, p. 69).  When Mr. Tomes sought treatment for shoulder pain in October 2020, he wrote in his sick call request:  "wisdom tooth/abcess [sic] tooth . . . tooth for 6 months."  (Sealed Doc. 27, p. 65).

acute, odontogenic infections" and using "multiple courses of antibiotics for odontogenic infections." (Sealed Doc. 27, p. 53). On October 7, 2020, Dr. Friedman removed the molar, tooth #31. (Sealed Doc. 27, pp. 49-51).

Thus, viewed in the light most favorable to Mr. Tomes, the evidence shows that in May 2020, a dentist diagnosed Mr. Tomes's need for dental treatment, namely the extraction of his right lower wisdom tooth, tooth #32, because the tooth was erupting at an angle, and the tissue surrounding the wisdom tooth was becoming infected. Because Mr. Tomes did not receive dental treatment when the dentist made the diagnosis, the situation deteriorated, and the pressure of the erupting wisdom tooth on the adjacent molar caused the molar to decay and become infected, leading to the extraction of the molar. *See Ramos*, 639 F.2d at 576 (finding that "inmates needing oral surgery had to wait an inordinate amount of time before receiving proper care" and that "inmates when not treated in a timely fashion are prone to develop infections and abscesses leading to continued and unnecessary pain and loss of teeth"). With this evidence, Mr. Tomes can establish a serious medical need and satisfy the objective component of his deliberate indifference claim.

The next component of Mr. Tomes's Eighth Amendment claim, the subjective component, "requires a showing that a prison official acted with deliberate indifference to the prisoner's serious medical need." *Goebert*, 510 F.3d at 1326 (citing *Bozeman,* 422 F.3d at 1272). "This means that the '[prisoner] must prove

three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" *Goebert*, 510 F.3d at 1326-27 (quoting *Bozeman,* 422 F.3d at 1272) (alteration added). "The meaning of 'more than gross negligence' is not self-evident," but in cases "that turn on the delay in providing medical care," where a prisoner contends he has "suffered increased physical injury due to the delay," a district court must consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327 (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1189 (11th Cir. 1994)).

With respect to the defendants' subjective knowledge of a risk of serious harm, the defendants, FCI-Talladega Warden Nash and Health Administrator Hansen, state in declarations that if a prisoner had a serious medical condition, they typically would receive notice of the condition. (Doc. 23-1, pp. 1-2, para. 5; Doc. 23-2, pp. 1-2, para. 5). Retired Warden Nash asserts that she does not "recall an inmate named John Tomes having a dental issue during [her] time as FCI Talladega's Warden." (Doc. 23-1, p. 1, ¶ 5). Administrator Hansen states that she does not recall Mr. Tomes or a prison staff member informing her that Mr. Tomes had a dental matter and that if she had been informed "from April through 26 September 2020, that any prisoner was experiencing a serious dental issue, [she] would remember it,"

and her regular practice would be to inform Warden Nash as well.  (Doc. 23-1, p. 1, ¶ 5).

Viewing the evidence in the light most favorable to Mr. Tomes, the Court recognizes that jurors would not have to credit Warden Nash or Administrator Hansen's statements, given their self-interest and medical records which reflect that prison nurses were fully aware that Mr. Tomes had a serious dental condition that required treatment.  To the extent that Warden Nash and Administrator Hansen may attempt to assign fault to visiting dentists for not informing them of Mr. Tomes's dental condition and his need for treatment, jurors could hold Warden Nash and Administrator Hansen responsible for Mr. Tomes having to rely on visiting dentists in the absence of a staff dentist.  *See Bailey v. Swindell*, 89 F.4th 1324, 1332 n. 6 (11th Cir. 2024) (quoting *Jackson v. Sauls*, 206 F.3d 1156, 1168 (11th Cir. 2000)) ("Section 1983 defendants 'are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions.'").

If jurors find that Warden Nash and/or Administrator Hansen were aware of Mr. Tomes's dental needs, then jurors also could conclude on the evidence in this case, including evidence of the defendants' responsibility for maintaining a complete medical staff, that Warden Nash and Administrator Hansen disregarded the risk.

As to conduct that is more than gross negligence, Mr. Tomes has presented evidence from which jurors could find that he had a serious dental need and that the

nearly six-month delay in extraction of his right lower wisdom tooth, tooth #32, caused infections and the loss of tooth #31, a tooth that was healthy but was compromised by the impact of the erupting adjacent wisdom tooth.  Finally, jurors could conclude that Warden Nash and/or Administrator Hansen were responsible for the delay because they allowed FCI Talladega to operate without a staff dentist for six months.  The evidence shows that as soon as a dentist joined the staff at FCI Talladega, Mr. Tomes received x-rays and the dental treatment he needed but lacked over the six-month period when the prison relied on visiting dentists who conducted superficial exams in prisoners' housing units, lacked access to diagnostic tools like x-rays, and provided no dental treatment, perhaps because they could not make a firm diagnosis without access to x-rays.  *See Goebert*, 510 F.3d at 1327.[8]  Mr. Tomes

---

[8] Mr. Tomes contends that he developed an infection in tooth #31, and he ultimately lost the tooth because FCI Talladega did not have a dentist on staff and did not have access to "an x-ray machine or extraction equipment."  (Doc. 37, p. 3).  Mr. Tomes asserts that tooth #31 decayed because his adjacent wisdom tooth "pushed into the back" of tooth #31.  (Doc. 37, pp. 3-4).  As discussed, Mr. Tomes's medical records substantiate his contention that delay caused his dental condition to worsen.  In May 2020, tooth #31, the molar beside Mr. Tomes's right lower wisdom tooth, appeared healthy.  By August 2020, the nurse who examined Mr. Tomes stated that he needed dental treatment for an abscess in the lower right side of his mouth.  In October 2020, when Mr. Tomes saw FCI-Talladega's new staff dentist, Dr. Friedman, Dr. Friedman informed Mr. Tomes of "the risks associated with acute, odontogenic infections" and the danger of using "multiple courses of antibiotics for odontogenic infections," the course of treatment FCI-Talladega provided to Mr. Tomes over several months as the prison waited to add a dentist to its staff.  (Sealed Doc. 27, p. 53).  Viewed favorably to Mr. Tomes, Dr. Friedman's advice to Mr. Tomes demonstrates that Mr. Tomes faced health risks because of the prison's band-aid of repeated treatment with antibiotic prescriptions, and he lost tooth #31 because of the delay in x-raying his mouth and extracting tooth #32.  *Board v. Farnham,* 394 F.3d 469, 482-83 (7th Cir. 2005) ("Unquestionably, the neglect of one's dental hygiene can, and frequently does, result in objectively serious dental and medical problems, which is illustrated by Duke's need to have a number of his teeth extracted.");  *Board*, 394 F.3d at 480 n. 4 ("The risks posed by tooth loss, the most common cause of which is periodontal disease (of which the most common form is known as gingivitis), cannot

asserts that the prison's lack of a dentist on staff is a "classic non-medical reason for delay" and argues that Eleventh Circuit precedent stands for the proposition that delay in medical treatment can support a claim for deliberate indifference to a prisoner's medical needs. (Doc. 37, p. 9) (citing *Ancata v. Prison Health Serv., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), and *Hill*, 40 F.3d at 1187-88).[9]  Mr. Tomes is correct.[10]

---

be underestimated.  Such diseases of the mouth are believed to sometimes contribute to coronary atherosclerosis and a myriad of heart problems, as well as bacterial infections such as transient bacteremia or sepsis, all of which are capable of causing death.  *See* Eugene Buaunwald, et al., HARRISON'S   PRINCIPLES OF INTERNAL   MEDICINE 194–95,   799–800   (15th ed.2001).");  *Board*, 394 F.3d at 483 n. 7 ("As mentioned above, periodontal disease or gingivitis, which is cause[d] by a lack of dental hygiene, is a serious medical condition which is manifested by the loss of teeth.  *See supra* note 4.  In addition, complications from this condition have been diagnosed as contributing to serious health problems including, but not limited to, heart complications, sepsis and even death.");  *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) ("Viewing the facts in the light most favorable to Moore, it took from April 1994 until December 1994 for Moore to receive adequate treatment for a toothache.  The tooth became infected and ultimately required extraction.  Something appears wrong with the dental care system.  The question before us is whether Moore has a civil rights claim that survives summary judgment.  We think it does.").

[9] In *Hill*, the Eleventh Circuit held that "[d]elay in access to medical attention can violate the Eighth Amendment, when it is tantamount to unnecessary and wanton infliction of pain," and "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay."  *Hill*, 40 F.3d at 1187-88 (citations and internal marks omitted) (italics in *Hill*).  In *Ancata*, the Eleventh Circuit stated that "if necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."  *Ancata*, 769 F.2d at 704.

[10] In their declarations, Warden Nash and Administrator Hansen did not mention the COVID-19 pandemic.  Should evidence regarding the pandemic develop as this case progresses, the Court notes that under BOP policy:  "fillings are considered a routine dental procedure. To receive routine dental care, inmates must be on the waiting list for care and care will be provided in chronological order; i.e., those waiting the longest will be seen first." "Urgent dental care" is defined as "treatment for relief of severe, acute dental pain, traumatic injuries, and acute infections" and is prioritized based on the level of urgency with which a prisoner presents at sick call.      *See* BOP      Program      Statement      #6400.03, available

With the evidence discussed above, Mr. Tomes can establish the subjective

component of his deliberate indifference claim.   Likewise, from the evidence

discussed, jurors could conclude that the defendants' failure to provide dental x-rays

and to have a dentist on staff between April 2020 and October 2020 caused Mr.

---

at https://www.bop.gov/policy/progstat/6400_003.pdf. (quoted in *Dugan v. Warden, FCC Coleman-USPI*, 673 Fed. Appx. 940, 945 n. 7 (11th Cir. 2016).

BOP's COVID-19 policy states:

> CONSIDERATIONS IN DECIDING TO POSTPONE OR RESCHEDULE CONSULTATIONS The decision to POSTPONE OR RESCHEDULE medical care in the community is considered an important and necessary response to this national emergency and is NOT made lightly. This decision is affected by several variables, including the category and urgency of the care, the safety and health of inmates and staff, and good clinical judgment. • Care for ACUTE, EMERGENT, OR URGENT CONDITIONS is medically necessary and Should NOT be postponed or rescheduled. > MEDICAL examples include, but are not limited to, myocardial infarction, hemorrhage, stroke, severe trauma, etc. > DENTAL examples include, but are not limited to, uncontrolled bleeding, cellulitis/swelling that potentially compromises the airway, trauma involving major facial bones, complications after oral surgery, significant pathology, etc. • NON-EMERGENT BUT MEDICALLY NECESSARY CARE is prioritized in part by the risk of deterioration, the likelihood of successful repair at a later time, and significant pain that impairs activities of daily living. The following SUGGESTED TIME FRAMES are based on the severity of the condition and the urgency of the intervention: > HIGHER PRIORITY: Schedule/re-schedule within 30 days. For example: Scheduled blood transfusion or IV infusions, unresolved pericoronitis. > INTERMEDIATE PRIORITY: Schedule/re-schedule within 30-90 days. For example: Routine pacemaker check, cancer surveillance imaging, tooth impactions with intermittent pain. > Low PRIORITY: Re-schedule within 90-180 days.

https://www.bop.gov/foia/docs/COVID_pandemic_plan_docs_v6_2021_07_16.pdf,   p.   89. Viewed in the light most favorable to Mr. Tomes, under BOP's COVID policy, Mr. Tomes should have received treatment within 30 days of his May 2020 visit with Dr. Beasley for "unresolved pericoronitis."  (Sealed Doc. 27, p. 56).

Tomes's delayed dental treatment for a serious dental condition, leading to dental infections, pain, and ultimately the loss of tooth #31.

For the foregoing reasons, the Court sustains Mr. Tomes's objections.  The Court denies the defendants' motion for summary judgment.  (Doc. 23).  Because there are disputed questions of fact regarding Mr. Tomes's Eighth Amendment claim, the Court also denies Mr. Tomes's motion for summary judgment.  (Doc. 31).  The Clerk of Court shall please term documents 23, 31, and 36.  The Court returns this matter to the magistrate judge for further proceedings.[11]

**DONE** and **ORDERED** this April 11, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[11] In the report, the magistrate judge concluded that because Mr. Tomes did not establish an Eighth Amendment violation, Mr. Tomes could not "overcome the defendants' qualified immunity defense."  (Doc. 36, pp. 16-17).  Because the Court has sustained Mr. Tomes's objections to the Eighth Amendment analysis in the report, on the current record, the analysis in the report regarding qualified immunity does not warrant summary judgment for the defendants.  The Court notes that BOP's COVID policy regarding the need for treatment within 30 days for "unresolved pericoronitis" likely would be part of a fuller discussion of qualified immunity.